# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **RALPH E. STEINBARTH**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11 C 8537 |
| | ) |
| **WHOLE FOODS MARKET**, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Ralph Steinbarth ("Steinbarth") has brought a complaint charging his former employer, Whole Foods Market ("Whole Foods"), with two counts of discrimination: a failure to promote him on the basis of race in violation of 42 U.S.C. § 1981[1] and the creation of a hostile work environment due to his race and national origin in violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII," Sections 2000e to 2000e-17). Steinbarth also advances a third count charging retaliation in violation of Section 1981.[2] Whole Foods has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 on all three counts, and its motion has been fully briefed. For the reasons stated here, its motion is granted.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).[3] For that purpose

---

[1] All further references to provisions of Title 42 will take the form "Section --," omitting the prefatory "42 U.S.C. §."

[2] Plaintiff's memorandum states that his Section 1981 claims are founded on race and national origin discrimination, but Section 1981 applies only to discrimination on the basis of race.

[3] At the summary judgment stage, of course, Steinbarth need not "establish" or "show" or "prove" anything, but must demonstrate only that a genuine issue of material fact exists. This

(continued)

courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir.2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts,[4] viewed in the light most favorable to nonmovant Steinbarth.

## Factual Background

From mid-2008 until his termination in early 2010 Steinbarth was a team member in the meat department at Whole Foods' Lincoln Park store (W.F. St. ¶ 2). Steinbarth identifies himself as German, Jewish, Polish, Cuban and Puerto Rican with Spanish roots (S. St. ¶ 1; W.F. St. ¶ 1). Steinbarth asserts that his team leader Augustin Murillo ("Murillo") discriminated against him because of both his German Jewish background and his Puerto Rican/Spanish background (Complaint ¶¶ 10-11, 18, 21). While Steinbarth's Hispanic "roots" (Steinbarth Dep.17:20) trace

_____

(footnote continued)
opinion employs the quoted terms only because the cited cases use that terminology, but it imposes on Steinbarth the lesser burden described earlier in this footnote.

[4] This District Court's LR 56.1, adopted to implement Rule 56, requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Steinbarth's LR 56.1 statement as "S. St. ¶ --," to Whole Foods' LR 56.1 statement as "W.F. St. ¶ --" and to the parties' respective responses to those statements as "S. Resp. ¶ --" and "W.F. Resp. ¶ --." Where a party's response does not provide a version of the facts different from the original statement, this opinion cites only the original statement.

back to Europe and specifically to Spain (W.F. St. ¶ 1), Murillo is of Mexican national origin (id. ¶ 5).

Murillo transferred to Whole Foods Lincoln Park in early 2009, after Steinbarth was already working there (W.F. St. ¶ 4). Shortly thereafter (Steinbarth Dep. 51:24-52:3) Whole Foods appointed Murillo the team leader for the meat department (W.F. Resp. ¶ 1). In that capacity his responsibilities included scheduling team members, ordering inventory, reviewing team members and training them (Murillo Dep. 10:16-10:19).

In late May 2009 Whole Foods Lincoln Park moved its store to another location in the community (Walsh Aff. ¶ 10). One day while setting up for that move in early February, Steinbarth and Murillo had a series of conversations in which Steinbarth's background arose several times (S. Resp. ¶¶ 4-11). More specifically, Murillo overheard Steinbarth speaking Spanish and commented that he had thought Steinbarth was "guero," which means "white" or "whitey" in Spanish (W.F. St. ¶ 5). Murillo asked Steinbarth about his heritage, and Steinbarth told Murillo that he was German, Jewish, Polish and Spanish (id. ¶ 6). Steinbarth also asserts that at that point he also told Murillo that he had Puerto Rican roots (W.F. Resp. ¶ 1).

When Murillo learned that Steinbarth was Jewish, Steinbarth explained that although he was sure he had "Jewish blood," he did not practice Judaism (S. Resp. ¶ 7). Murillo repeated "Judio," which means Jewish in Spanish (id.), and said "you must be a Jew, you have Jewish blood" (W.F. Resp. ¶ 1). According to Steinbarth Murillo had a "look of disgust on his face," "a very sour look" "as if he had bit into a lemon" (id.). Murillo also allegedly stated that the Spanish raped the Mayans (S. Resp. ¶ 7). That same day Steinbarth and Murillo also discussed Steinbarth's family company, La Preferida, with Steinbarth stating that if Murillo ate beans he

most likely bought beans manufactured by that company (W.F. St. ¶ 8). Steinbarth says that Murillo initially refused to believe that was the case, but Steinbarth told Murillo to research the company online, and later that afternoon Murillo conceded that Steinbarth was correct (W.F. Resp. ¶¶ 6-7; Steinbarth Dep. 67:2).

**Promotion to Meat Cutter Apprentice**

In late January or early February of 2009 Steinbarth requested a "job dialogue" with Murillo (S. Resp. ¶ 13) -- effectively an employer review that is formally initiated by the employee (id. ¶ 12) but that is expected to occur about every six months (Steinbarth Dep. 36:19). Murillo had a backlog of job dialogues to complete (W.F. St. ¶ 14; Murillo Dep. 30:8-30:13), so that Steinbarth's first review was not completed until April (S. Resp. ¶ 13). During that job dialogue Steinbarth expressed his desire to become a meat cutter (S. St. ¶ 11), a more advanced role in the meat department that carries a pay raise (Gutierrez Dep. 17:4-17:5). To become a meat cutter inexperienced candidates such as Steinbarth first had to train formally as meat cutter apprentices (W.F. St. ¶ 20), a job that also carries a pay raise (S. Resp. ¶ 23). When Steinbarth voiced his desire to become a meat cutter, Murillo told him that he would have to wait for a position to open but that once another employee, Carlos, completed his meat cutter apprenticeship, Steinbarth could begin one (W.F. St. ¶ 20). In fact, according to Steinbarth, the two prior team leaders had told him the same thing (Steinbarth Dep. 85:3-85:5).

Despite his clearly voiced interest, Steinbarth never became either a meat cutter apprentice or a meat cutter. Importantly, he admits that he never filed a formal paper application for the job, for he never saw any openings for inexperienced meat cutters (W.F. St. ¶¶ 21-22).

At the end of 2009 Murillo promoted Israel Gutierrez ("Gutierrez"), who is of Mexican national origin, to a meat cutter apprentice position. At that time Gutierrez had held the same position as Steinbarth at Whole Foods (W.F. Resp. ¶ 12). Gutierrez had previously worked with Murillo at Whole Foods' Willowbrook store, and on occasion the two would grab a drink after work (id.). After Murillo moved to the Lincoln Park location, Gutierrez transferred with Murillo's help (id.). Murillo had earlier told Gutierrez that there were no open positions, but he later told Gutierrez there was an opening for a meat cutter apprentice, and Gutierrez accepted the job and moved locations (id.). Before that transfer Gutierrez had some "informal" experience cutting meat, although "it was just for a customer" and "[s]o [he] didn't need . . . a special cut or something" (S. Resp. ¶ 24; Gutierrez Dep. 39:15-39:18). Upon the transfer and for several months thereafter Gutierrez worked as a regular member of the meat team, but according to Steinbarth he received informal training in meat cutting for which he was later promoted (W.F. Resp. ¶ 12).[5] Gutierrez became an official apprentice in December 2009.

**Hostile Work Environment and Steinbarth's Complaints to Whole Foods**

Steinbarth asserts that Murillo repeatedly "jab[bed]" him about his background (W.F. Resp. ¶ 20), assigned him unfavorable work schedules (W.F. St. ¶ 40) and spoke to him in a condescending manner (S. Resp. ¶ 62). Although Steinbarth does not enumerate specific "jabs" in his statement of facts or memorandum, it would appear that the "jabs" included asking what Steinbarth ate for dinner and if he ate sauerkraut (W.F. St. ¶ 54), using the Caribbean term

---

[5] Gutierrez' deposition testimony on that subject is to the same effect at some points but not at others. Under Rule 56 standards this opinion credits Steinbarth's version.

"habichuelas" instead of "frijoles," which is more often used in Mexico (id. at ¶¶ 57-58), and the mispronunciation of German words that Steinbarth attempted to teach Murillo (id. at ¶ 53).

With respect to Steinbarth's scheduling problems, Steinbarth felt that Murillo disproportionately assigned him to the closing shift -- toward the end of his time he was closing "religiously" (id. ¶ 46). Additionally he rarely had weekends off or two days off in a row (Steinbarth Dep. 72:11-72:17).[6] Yet Steinbarth also admits that he had indicated his open scheduling availability (W.F. St. ¶ 40). In addition to his complaints about closing shifts and weekends, Steinbarth further asserts that he had to contact other stores to make his requisite 40 hours of work per week (S. Resp. ¶ 31), but it is undisputed that Steinbarth did that on only two occasions for a total of 13.5 hours (W.F. St. ¶ 34), and that those occurred just before the store opening (Walsh Aff. ¶¶ 8, 10), when Whole Foods had told its employees that labor was going to be "shave[d] . . . close to the bone" (Steinbarth Dep. 76:23-76:24).

Steinbarth further asserts that Murillo often reprimanded him using a condescending tone of voice and in a manner different from how he reprimanded other team members, and that Murillo "sneered" when customers asked for Steinbarth's assistance (S. Resp. ¶¶ 62-64). Finally, Steinbarth contends that Murillo "jerked [him] around" from responsibility to responsibility (Steinbarth Dep. 104:17-104:22), although the only specific instance he cites is that Murillo initially assigned him to wash dishes "until he realized" that Steinbarth should be doing other things (id.).

---

[6] Steinbarth also says some of his requests for days off were denied and that others had an easier time requesting time off, but he does not complain that he faced additional issues once he complied with the proper procedure for requesting time off (S. Resp. ¶¶ 50, 52).

Steinbarth asserts that he complained about his job to Payroll Benefits Specialist Jennifer Brisbane-Walsh ("Brisbane-Walsh") at least twice formally and informally on other occasions (Steinbarth Dep. 35:14-35:24).[7]  In his first meeting with Brisbane-Walsh Steinbarth reported that his job dialogue had been delayed for two months and discussed his problems with scheduling and hours (id. at 90:6-90:7).  At some point in that conversation Steinbarth and Brisbane-Walsh "talked about background maybe being an issue," and Steinbarth says he mentioned that some people of "Mexican heritage don't get along with people with Puerto Rican heritage and vice versa" (W.F. Resp. ¶ 14).  Steinbarth felt that Brisbane-Walsh was dismissive of his complaint when she told him that it was a hard time because the store was moving locations and that "it will get better" after the store's relocation (W.F. Resp. ¶ 16; S. Resp. ¶ 72).  Shortly after that meeting Brisbane-Walsh advised Murillo about Steinbarth's complaint that his job dialogue was overdue (S. Resp. ¶ 73).  There is no evidence that she told Murillo about the discussion that background was "maybe" an issue (id.) or of any other complaints about discrimination (Steinbarth Dep. 100:1-101:24, 138:15-139:1).[8]

---

[7] Although there is a dispute as to whether and to what extent Steinbarth notified Whole Foods of his sense that he was being mistreated as he now alleges, this Court again inferentially credits Steinbarth's version.

[8] Murillo testified that the only specific issue he ever remembers Brisbane-Walsh reporting to him was that Steinbarth had complained about his delayed job dialogue in April (Murillo Dep. 42:12-42:13).   Steinbarth argues that Murillo would have been informed of his complaints that background might be an issue because Murillo testified that Brisbane-Walsh had a habit of coming to team leaders with complaints (S. Resp. ¶ 73).  But the fact that Brisbane-Walsh had a habit of reporting general complaints does not give rise to the inference that she would have also reported every single detail of her communications with employees.  Moreover, while Murillo may have found Brisbane-Walsh generally communicative, he did not testify that she always reported everything she learned to team leaders -- nor would he have had any foundation to do so.

**Asserted Retaliation**

On New Year's Eve 2009 Steinbarth was working in the meat department when he took off his gloves and put them on the counter in plain view of the customers (W.F. St. ¶¶ 80-81). Steinbarth knew that he was violating Whole Foods' policy in doing so, but he testified he was helping a customer who would want to know that he had removed his gloves (id. ¶ 82). Yet by placing his gloves on the counter, Steinbarth obviously increased the risk of contamination across the meat sections (Murillo Dep. 109:1-109:11).[9] When Murillo noticed what Steinbarth had done, he reprimanded Steinbarth, as he had done repeatedly in the past for identical behavior (W.F. St. ¶ 85).

Steinbarth followed Murillo into the back room and asked Murillo whether he could have been a bit more professional and reprimanded Steinbarth in private (id. ¶ 87). Murillo explained that he did not intend to embarrass Steinbarth and that he simply viewed the situation as a coaching opportunity (id. ¶ 88). Steinbarth walked away from Murillo and into Murillo's office, where Steinbarth was alone, and he began cursing repeatedly in Spanish -- he shouted "cono, caramba, puneta, pendejo" approximately 12 times, terms that Steinbarth translates to "darn it, damn it, shit, fuck" (id. ¶ 92). Murillo testified that he heard Steinbarth call him a "puto pendejo" twice, a term that Murillo translated to mean "fucking faggot" (id. ¶ 93) -- if true, that

---

[9] In his Declaration Steinbarth said that leaving the gloves on the counter did not create a health risk because he handled only chicken with his gloves and because the counter was used only for chicken, so that there was no risk of cross-contamination across other meats (Steinbarth Decl. ¶ 7). That attempted justification misses Whole Foods' rationale entirely, for the risk was not that the gloves would come into contact with another meat group, but rather that the juices from the gloves would get onto the countertops and might transfer to the outside of the paper meat packaging used to wrap the chicken on the countertop. In turn the bacteria on the outside of the paper packaging could then transfer to other products (Murillo Dep. 109:4-109:11).

- 8 -

would constitute a major infraction of Whole Foods policy (Steinbarth Dep. 25:17). Gutierrez also filed a written statement that he heard Steinbarth call Murillo a "puto pendejo" (W.F. St. ¶ 101). Steinbarth, however, contends that he said no such thing and that what Murillo and Gutierrez overheard were the last two words -- "puneta, pendejo" -- of the combination "cono, caramba, puneta, pendejo" (S. Mem. 13; Steinbarth Dep. 192:6-192:9; S. Resp. ¶ 94).

In reliance on the reports that Steinbarth had called his supervisor a "fucking faggot" in Spanish, a management team (not including Murillo) decided to terminate Steinbarth (S. Resp. ¶ 104). Nothing in the record suggests that any of those individuals had any reason to doubt the reports that Steinbarth had called Murillo a "fucking faggot" (id. ¶¶ 98-111).

## Steinbarth's Contentions

**Failure To Promote**

Disparate treatment claims such as a failure to promote can be established using either the "direct" method of proof or the "indirect" burden-shifting method identified in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (see, e.g., Adams v. City of Indianapolis, 742 F.3d 720, 735 (7th Cir. 2014)). Steinbarth proceeds solely under the indirect burden-shifting approach for his failure-to-promote claim. That approach requires Steinbarth to demonstrate that "1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff" (Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003)). If a plaintiff can establish a prima facie case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for not promoting

plaintiff (Adams, 742 F.3d at 735).  If defendant does so, the burden shifts back to plaintiff to show that the explanation is a pretext for discrimination (id.).

A. **Prima Facie Case**

Steinbarth has produced evidence in an effort to make out a prima facie case.  Neither party disputes that Steinbarth is a member of a protected class, so that Steinbarth meets the first part of the test.  This opinion therefore goes on to discuss the other three elements.

1. **Application and Qualification for Promotion**

Steinbarth effectively applied in April 2009 when he expressed his desire to become a meat cutter to Murillo.  To be sure, an informal expression of interest in a job is generally insufficient, and "the plaintiff must first show that she properly applied for the position" (Hill v. Potter, 625 F.3d 998, 1003 (7th Cir. 2010)).  But if "an employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the application requirement of the prima facie case is loosened somewhat" and "the plaintiff can establish the application element of a prima facie case by showing that, had she known of an . . . opening, she would have applied" (Box v. A&P Tea Co., 772 F.2d 1372, 1377 (7th Cir. 1985)).

Here Steinbarth testified that he did not see a meat cutter position posted, and Whole Foods has not argued that it was.  With reasonable inferences drawn in the light most favorable to nonmovant Steinbarth, this Court presumes that the job was not posted and that Gutierrez was instead promoted through a less formalized application process (a presumption consistent with Gutierrez's own testimony that his position as a meat cutter apprentice was "formalized" as a matter of course (Gutierrez Dep. 18:8-18:11)).  Because Steinbarth repeatedly informed his team

leaders of his desire to become a meat cutter, it may further be inferred that he would have applied if he had known of an opening to train as a meat apprentice.

As for Steinbarth's qualifications to become a meat cutter apprentice, he neither mentions his own qualifications nor, indeed, identifies what the objective qualifications are for the position. But he does assert, and Whole Foods admits, that Murillo told him he would be next in line to train as such an apprentice. Again with the benefit of reasonable inferences in his favor, that suggests that Steinbarth had the requisite qualifications for the job.

### 2. Rejection from Position

Because Murillo told Steinbarth that there were no open positions but that he would be next in line after Carlos, and because Carlos was still working at the time that Gutierrez was promoted and even on the date when Steinbarth was terminated, Whole Foods argues that Steinbarth was never officially "rejected" (W.F. Mem. 7-8). That is unpersuasive. Indeed, some cases frame the third prong of the prima facie test differently: Rather than state that the plaintiff must be rejected from the position, they say that the plaintiff simply "did not receive" the promotion (Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir. 1996)). For example, the fact that a company "passed over" an individual for several new positions that it simultaneously created and filled has been found sufficient to support a failure-to-promote claim (id. at 630). Here the situation is reasonably similar: Whole Foods passed over Steinbarth for the next available meat cutter apprenticeship position.

### 3. Decision To Promote Gutierrez Instead of Steinbarth

To satisfy the final element of the prima facie analysis, Steinbarth must show that Gutierrez was equally or less qualified than he was for the position. Here courts examine "all the

relevant factors," including "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision" (Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)). Most importantly, courts must not "sit as super personnel departments, second-guessing an employer's facially legitimate business decisions" (id.).

Whole Foods argues that Gutierrez had more experience cutting meat and was an "unofficial" meat cutter apprentice before his official appointment in December (W.F. Mem. 8)[10]. Viewed solely on its own, that rationale does not fly because Steinbarth contends that Gutierrez received his informal meat cutting training as a result of the same alleged discrimination that motivated the later formal promotion of Gutierrez to meat cutter apprentice (see Fischer v. Avanade, Inc., 519 F.3d 393, 402-03 (7th Cir. 2008)).

But Whole Foods retorts that Gutierrez was a superior candidate because Murillo found Steinbarth to be "a little distracted from his job responsibilities" and "has a little bit of—lack of knowledge on what we sell in Whole Foods and the product we sell in the [m]eat [d]epartment" (Murillo Dep. 32:2-32:5).[11] It is not then surprising that Murillo elected to train Gutierrez ahead

---

[10] Citations to Whole Food's memorandum and Steinbarth's memorandum take the respective forms "W.F. Mem. --" and "S. Mem. --," while Whole Foods' reply memorandum is cited "W.F. R. Mem. --."

[11] Steinbarth attempts to counter that by pointing to his April job dialogue, where Murillo gave him a positive job review, including a 4 out of 5 rating on his product knowledge (Ex. D to W.F. St.). But that does not contradict Whole Foods' ultimate business judgment that Steinbarth's qualifications did not meet those that Murillo knew Gutierrez possessed. Indeed, Murillo had earlier worked closely with Gutierrez and told him that he really liked the way he worked and that he was a hard worker (Gutierrez Dep. 14:12-14:13).

of Steinbarth. Because Steinbarth produced no evidence to support the view that he was at least equal to Gutierrez, he has failed to make out a prima facie case unless that reason proves to be pretextual.

### B. Proffered Non-Discriminatory Rationale and Pretext

Whole Foods' proffered non-discriminatory rationale is the same as its argument just summarized above. Thus the question for summary judgment purposes becomes whether there is evidence of pretext.

Pretext is "a lie, specifically a phony reason for some action" (Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995)). It "does not require that the facts presented by the defendant as the reason for its employment action not be true, only that they not be the reason" (Emmel, 95 F.3d at 634). When a company proffers "a plausible reason [that] was not in fact the reason, it is pretextual" (id.). Yet, as already emphasized, courts "must avoid stepping into the role of [a] super-personnel department" (id. at 633). In this instance Whole Foods has proffered plausible reasons for promoting Gutierrez, and Steinbarth has produced no evidence that allows this Court to discredit those reasons. Because Steinbarth cannot make out a prima facie case or show pretext, this Court must -- and does -- reject Steinbarth's failure-to-promote theory.

**Hostile Work Environment**

Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 426 (7th Cir.2004) has reconfirmed our Court of Appeals' earlier definition of "hostile environment" as one that is "permeated with discriminatory intimidation, ridicule, and insult." Under Title VII there are four elements of a hostile work environment claim: (1) the work environment must have been both subjectively and objectively offensive; (2) the protected status must have been the cause of the harassment;

(3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability (Chaib v. Ind., 744 F.3d 974, 985 (7th Cir. 2014)). Steinbarth's Memorandum points to several items in attempted support of his harassment claim: the February comments Murillo made about Steinbarth's background, Steinbarth's scheduling problems (including his having to contact other stores to make 40 hours on two occasions) and the periodic "jabs" from Murillo regarding his German Jewish and Puerto Rican background. In an anticipatory mode, Whole Foods adverts to other asserted matters from Steinbarth's deposition: that Murillo "jerked" him around with regard to responsibilities, that Murillo delayed his job dialogue and that Murillo used a condescending tone when speaking to him.[12] As the ensuing discussion shows, Whole Foods is ultimately entitled to prevail on this issue because Murillo's isolated remarks, "jabs" and condescension are not sufficiently severe or pervasive to constitute a hostile work environment, and the remainder of the cited instances are not causally linked to Steinbarth's race or national origin.

### A. Isolated Remarks and Tone Are Not Sufficiently Severe or Pervasive

Murillo's February remarks and periodic "jabs" are simply not sufficiently severe or pervasive to constitute a hostile work environment. Not all conduct, even if motivated by a discriminatory animus, is actionable -- instead the conduct must be "both subjectively and

---

[12] Whole Foods also anticipates and dismisses two other potential items from Steinbarth's testimony: (1) that he had regular problems making his 40 hours a week (Steinbarth Dep. 75:11-75:24) and (2) that he was denied overtime (id. at 78:4-78:12). Because Steinbarth does not respond to those arguments in his memorandum and because that memorandum explicitly stated that he does not "seek to assert claims or recover for reduced work hours[,] denial of overtime[,] or denial of his preferred work schedule based on race/national origin" (S. Mem. 2), this opinion does not address those issues, other than to observe that there is no evidence to support the conclusion that either issue is causally related to Steinbarth's protected status.

objectively so severe or pervasive as to alter the conditions of ... employment and create an abusive working environment" (reconfirmed in Whittaker v. N. Ill. Univ., 424 F.3d 640, 645 (7th Cir. 2005)).  In weighing whether conduct creates an objectively hostile work environment, courts look at all of the circumstances, considering "the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work" (id.).

There is no disputing that some of Murillo's conduct, if indeed as alleged, was repugnant -- but it did not rise (or perhaps "fall" might be a more appropriate verb) to the level of actionable conduct under Title VII.  Isolated instances, unless extremely serious, do not suffice to constitute a hostile work environment (Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)), and our Court of Appeals has held that the added presence of condescension or speaking down to an employee does not give rise to actionable harassment (Moser v. Ind. Dep't of Corrections, 406 F.3d 895, 902-03 (7th Cir. 2005)).  While a parsing of Seventh Circuit jurisprudence in this area appears to reveal some tension in the caselaw, in which remarks that might not perhaps be viewed as dramatically different in kind have yet been held actionable in some cases but not in others (compare, for example, Logan v. Kautex Textron N. Am., 259 F.3d 635, 638, 641 (7th Cir. 2001), Cerros v. Steel Techs., Inc., 288 F.3d 1040, 1042, 1047 (7th Cir. 2002), Hrobowski v. Worthington Steel Co., 358 F.3d 473, 476-77 (7th Cir. 2004) and Ezell v. Potter, 400 F.3d 1041, 1048  (7th Cir. 2005)), this case certainly falls on the nonactionable side of the line.[13]

---

[13]  Justice Benjamin Cardozo, in his 1928 book The Paradoxes of Legal Science (written before his elevation to the United States Supreme Court) described the courts as not essaying to define "due process of law" but rather as saying:

(continued)

In short, it must be concluded that under the caselaw Murillo's comments in February 2009, though coupled with his asserted condescension and "sneering," are simply not sufficiently severe or pervasive to constitute a hostile work environment.[14] Nor were the "jabs" that the parties enumerated in their memoranda. Even though Steinbarth generalized that those occurred "regularly," he provided no explanation of what "regularly" means -- in fact, after the store opening he and Murillo did not see each other very often because he was "religiously closing" (Steinbarth Dep. 120:10-120:15) -- and so "we cannot consider the few comments detailed . . . to be pervasive" (Ezell, 400 F.3d at 1048). In further support of the conclusion that Murillo's comments and tone did not create a hostile work environment, there is no evidence that Steinbarth's performance at work suffered -- to the contrary, Steinbarth testified that he enjoyed his duties "and did them with gusto" (Steinbarth Dep. 105:6-105:7).

### B. There Is No Evidence that the Remainder of Murillo's Conduct Was Motivated by Any Discriminatory Animus.

Moreover, no other evidence indicates that the remainder of Murillo's conduct was causally related to Steinbarth's race or national origin. Although conduct need not be explicitly discriminatory, the plaintiff must at least be able to attribute a discriminatory "character or purpose" to it (Vance v. Ball State Univ., 646 F.3d 461, 470 (7th Cir. 2011), aff'd, 133 S. Ct. 2434 (2013)).

---

(footnote continued)
    We will leave it to be "pricked out" by a process of inclusion and exclusion in individual cases.

Just so here.

[14] Have the federal courts institutionalized the time-hallowed childhood "sticks and stones" response to name-calling?

1. **Scheduling Problems**

There is no evidence that Steinbarth's scheduling problems (the fact that he was always closing or the fact that he rarely had two weekdays or weekends off) arose from any discriminatory animus. Steinbarth himself indicated his open scheduling availability. Additionally, there is no evidence that he was treated any differently from any comparable employee, save one[15]—who Steinbarth admits received favorable treatment "on the basis of his good friends[hip]" with Murillo, rather than his ancestry or race (Steinbarth Dep. 248:5-248:11; S. Resp. ¶ 43). In any event, absent an accompanying reduction in pay or duties (which were not present here), changes in work schedule have been held insufficient to support hostile work environment claims because they do not constitute adverse employment actions (Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001)).

Similarly, no evidence suggests that Steinbarth had to work at other stores due to any discriminatory animus. Steinbarth had to seek out such work only two times, and both instances occurred around the time of the new store opening, when management told everyone that labor was being cut as much as possible.

2. **"Jerking" Around from Responsibility to Responsibility**

Nor are there any grounds on which to find that Steinbarth's race or national origin gave rise to Murillo's "jerking" Steinbarth around from responsibility to responsibility. Murillo's very job was to assign Steinbarth to different tasks. Furthermore, "[b]are allegations not supported by

---

[15] Though Steinbarth points to two other individuals who allegedly had greater scheduling flexibility than he, each of those comparisons is flawed: He points to "Eric," whose race or national origin is entirely unknown, and to Gutierrez, who worked a second job and had restricted his availability (S. Resp. ¶¶ 42, 44).

specific facts are insufficient in opposing a motion for summary judgment" (reconfirmed in Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1036 (7th Cir. 2003)). All Steinbarth provides in factual terms is that Murillo initially assigned him to wash dishes before Murillo knew Steinbarth's abilities. That does not support any inference of discrimination.

### 3. Delayed Job Dialogue

As to Steinbarth's delayed job dialogue, it is undisputed that Murillo had a backlog of other job dialogues to complete before he could get to that of Steinbarth. Again there is no ground on which to conclude that Steinbarth's race or national origin motivated any delay. Steinbarth actually received back pay for the delay from February (S. Resp. ¶ 13).

### 4. Condescension and "Sneering"

Finally, although Steinbarth contends that Murillo spoke differently to him than he did to other employees (and "sneered"), no evidence indicates that Steinbarth's race or national origin motivated that conduct. To the contrary, Steinbarth himself stated that Murillo's condescension began "even before we had formal discussions in February" (Steinbarth Dep. 112:16-112:19).

**Retaliation**

Whole Foods is also entitled to prevail on Steinbarth's final count asserting retaliation. Steinbarth argues that his firing in December, 2009 constituted retaliation against him for his alleged complaints to Brisbane-Walsh (S. Mem. 13-14), but the record does not bear him out.

To make out a case for retaliation, again a plaintiff may use the direct or indirect method of proof (Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008)). Because Steinbarth's memorandum proceeds solely under the direct method of proof, this opinion does the same. Under that method there must be evidence that shows (1) that

specific facts are insufficient in opposing a motion for summary judgment" (reconfirmed in Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1036 (7th Cir. 2003)). All Steinbarth provides in factual terms is that Murillo initially assigned him to wash dishes before Murillo knew Steinbarth's abilities. That does not support any inference of discrimination.

### 3. Delayed Job Dialogue

As to Steinbarth's delayed job dialogue, it is undisputed that Murillo had a backlog of other job dialogues to complete before he could get to that of Steinbarth. Again there is no ground on which to conclude that Steinbarth's race or national origin motivated any delay. Steinbarth actually received back pay for the delay from February (S. Resp. ¶ 13).

### 4. Condescension and "Sneering"

Finally, although Steinbarth contends that Murillo spoke differently to him than he did to other employees (and "sneered"), no evidence indicates that Steinbarth's race or national origin motivated that conduct. To the contrary, Steinbarth himself stated that Murillo's condescension began "even before we had formal discussions in February" (Steinbarth Dep. 112:16-112:19).

**Retaliation**

Whole Foods is also entitled to prevail on Steinbarth's final count asserting retaliation. Steinbarth argues that his firing in December, 2009 constituted retaliation against him for his alleged complaints to Brisbane-Walsh (S. Mem. 13-14), but the record does not bear him out.

To make out a case for retaliation, again a plaintiff may use the direct or indirect method of proof (Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008)). Because Steinbarth's memorandum proceeds solely under the direct method of proof, this opinion does the same. Under that method there must be evidence that shows (1) that

he engaged in a statutorily protected activity, (2) that he suffered a materially adverse employment action and (3) that there is a causal connection between the two (id.). As to causal connection, unless there is "something akin to an admission" that the protected conduct caused Whole Foods to fire Steinbarth, Steinbarth must provide "a convincing mosaic of circumstantial evidence" that supports the inference of retaliation (reconfirmed in Hobgood v. Ill. Gaming Board, 731 F.3d 635, 643 (7th Cir. 2013)). Such circumstantial evidence includes, among other things, suspicious timing and ambiguous statements (id.).

Steinbarth's claim unquestionably fails because there is no evidence of any causal connection between his alleged complaints to Brisbane-Walsh and the ultimate decision to terminate his employment. Steinbarth relies on a "cat's paw" theory of liability and argues that Murillo acted with an improper motive by (according to Steinbarth) falsely reporting that Steinbarth called Murillo a "fucking faggot." Although Murillo did not make the decision to fire Steinbarth, "a final decision-maker's reliance on an improperly motivated recommendation from a subordinate may render the corporate employer liable because the subordinate acts as the firm's agent" (see, e.g., Smith v. Bray, 681 F.3d 888, 897 (7th Cir. 2012)). In short, Steinbarth's theory is that Murillo knew Steinbarth had complained about discrimination[16] and retaliated against him for it by falsely reporting misconduct.

But the record is entirely devoid of any evidence that Murillo knew that Steinbarth ever engaged in any protected activity, and so it is impossible for Steinbarth to show that there was

---

[16] It should be noted that the record as to whether Steinbarth even complained about discrimination is exceedingly thin -- but it does not matter for the purposes of this opinion, because the requisite causal connection between any alleged complaints and the ultimate decision to fire Steinbarth is lacking anyway.

any causal link between his alleged complaints about background being an issue and Murillo's decision to report Steinbarth's conduct. Murillo's awareness of Steinbarth's general complaints is insufficient, because general complaints about workplace issues do not constitute protected activity (Huang v. Continental Cas. Co., 754 F.3d 447, 451 (7th Cir. 2014)). Thus Steinbarth's "cat's paw" theory of liability fails.[17]

**Conclusion**

For the reasons set forth in this opinion, Steinbarth has failed to demonstrate that there is any genuine issue of material fact as to any of the theories advanced in the three counts that make up his Complaint. Accordingly Whole Foods is entitled to a judgment as a matter of law, and its Rule 56 motion (Dkt. 47) is granted. This action is dismissed.

                                                    Milton I. Shadur
                                                    Senior United States District Judge

Date: November 5, 2014

---

[17] Steinbarth understandably does not argue that any of the decisionmakers were themselves motivated to terminate him out of a retaliatory animus (S. Mem. 13-14), for there is no support for such a theory either. There is no evidence that the management team was "motivated by anything other than business judgment" when it decided to fire Steinbarth for allegedly calling Murillo a "fucking faggot" (Gates v. Caterpillar, Inc., 513 F.3d 680, 686 (7th Cir. 2008)).